UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANIMAL LEGAL DEFENSE FUND, et al.,

 Plaintiffs,

 v.

UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

 Defendants.

Case No.  24-cv-03093-JD

**ORDER RE SUMMARY JUDGMENT AND NEXT STEPS**

In this Freedom of Information Act (FOIA) case, plaintiffs Animal Legal Defense Fund (ALDF) and Food and Water Watch (FWW) seek to require defendants Farm Service Agency (FSA) and its parent agency, the United States Department of Agriculture (USDA), to proactively post environmental review records to an online reading room as they are created, and to disclose information in previously produced records that was withheld under FOIA exemptions. *See* Dkt. No. 1. Each side filed a motion for summary judgment. Dkt. No. 38 (ALDF and FWW motion); Dkt. No. 44 (government's cross-motion).

Summary judgment is granted in favor of the government on the question of proactive posting of future documents. Summary judgment is granted in part in favor of ALDF on some of the withheld information. To close out this litigation, a couple of ancillary issues will benefit from additional steps by the parties. These issues were not impediments to the summary judgment determinations made here, but are loose ends that should be resolved. The order imposes deadlines for the follow-up work.

**BACKGROUND**

The parties' familiarity with the record is assumed. In pertinent summary, FSA administers loans and loan guarantees to agricultural producers. Before a loan or guarantee issues,

United States District Court
Northern District of California

FSA is required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), to assess the potential environmental impact of the financing arrangement. The assessment typically generates a number of agency records.

Plaintiffs are well-known national nonprofit organizations that are active on issues of animal welfare and food safety. *See* Dkt. No. 1 (complaint) ¶¶ 7-8; Dkt. No. 38-1 (ALDF decl.) ¶ 3; Dkt. No. 38-2 (FWW decl.) ¶ 3. They are particularly engaged on the topic of concentrated animal feeding operations (CAFOs), which are said to "confine hundreds to thousands of cows, thousands of pigs, and/or tens of thousands or even millions of turkeys or chickens for the purposes of producing meat, dairy, and egg products." Dkt. No. 38-1 ¶ 5; *see also* Dkt. No. 38-2 ¶ 6. Plaintiffs view CAFOs as significant sources of "unchecked pollution," "public health risks," "ecological damage," and other adverse environmental and community effects. Dkt. No. 1 ¶ 8; Dkt. No. 38-1 ¶ 5.

Plaintiffs seek "to ensure transparency in the CAFO system" and "to hold the government accountable" for CAFO decisions. Dkt. No. 1 ¶¶ 7-8. To those ends, plaintiffs regularly propound FOIA requests to USDA and other government agencies "to shed light on the government's role in enabling the factory farm industry." *Id.* ¶ 8; *see also* Dkt. No. 38-1, Exh. D (ALDF's prior FOIA requests); Dkt. No. 38-2, Exh. A (FWW's prior FOIA request). The FOIA request in play here was submitted on January 18, 2024, and requested a broad swath of NEPA documents for loans and guarantees made to CAFOs between January 2022 and January 2024. Dkt. No. 1 ¶ 49; *see also* Dkt. No. 38-1, Exh. G (1/18/2024 FOIA request). The request covered all 50 states and asked to "prioritize" the production of records for 8 specific states. *Id.*; *see also* Dkt. No. 38-1, Exh. I (ALDF email explaining scope of request).

Plaintiffs concluded that USDA did not do all that FOIA commands, and so this lawsuit ensued. Count One alleges on behalf of ALDF and FWW that USDA has an obligation under FOIA Section 552(a)(2), 5 U.S.C. § 552(a)(2), to proactively post on the USDA's online reading room documents of the sort plaintiffs requested, without being asked first in a specific FOIA request. Dkt. No. 1 ¶¶ 64-69. Count Two alleges on behalf of ALDF only that USDA improperly

redacted and withheld records responsive to the request in violation of FOIA Section 552(a)(3), 5 U.S.C. § 552(a)(3). *Id*. ¶¶ 70-71.

This is not the first time ALDF and FWW have filed cases against USDA under FOIA or in connection with CAFOs. *See, e.g., Animal Legal Defense Fund v. U.S. Dep't of Agriculture*, 935 F.3d 858 (9th Cir. 2019) (FOIA claims re USDA's online reading room) (hereinafter, *ALDF*); *Food & Water Watch v. U.S. Dep't of Agriculture,* 451 F. Supp. 3d 11 (D.D.C. 2020) (NEPA claims re CAFOs). Other nonprofit organizations have also sued USDA on these issues. *See, e.g., The Humane Society of the U.S. v. U.S. Dep't of Agriculture*, 549 F. Supp. 3d 76 (D.D.C. 2021) (FOIA claims re FSA loans or guarantees to animal processing facilities in California).

As is true in many FOIA cases, a major concern is the drawn-out timeline of the government's response. It is no secret that the processing of FOIA requests typically moves like molasses. *See, e.g., Lipton v. U.S. Envt'l Protection Agency*, 316 F. Supp. 3d 245, 247 (D.D.C. 2018) ("[A]gencies may take months to respond, and an incomplete or delayed answer can mean months longer in court."). The problem here, in plaintiffs' view, is that the slow pace of production substantially impedes their participation in the NEPA process for CAFO loans and guarantees. As ALDF stated:

> Without ready access to the NEPA documents, ALDF, its members, and the public, cannot provide the agency with important information on the environmental impact of the agency's proposed action. What this means is that without timely access to NEPA CAFO Records, ALDF members and others in rural communities do not know that federal taxpayer-funded CAFOs are being created or expanded near them until it is too late -- by the time they discover a CAFO under construction, they no longer have access to a public comment process to raise concerns to either stop or alter the federal funding decisions in ways that would mitigate harm.

Dkt. No. 38-1 (ALDF decl.) ¶ 11.

In fairness to the agencies, the prolonged response times are attributable at least in part to the burdens inherent in responding to broad FOIA requests. Here, for example, USDA stated without dispute by plaintiffs that the January 2024 FOIA request triggered outreach to "the local FSA employee in one of the 2,000 plus county offices" nationwide to start the collection of documents. Dkt. No. 44 at 4; Dkt. No. 44-1 (McMillin decl.) ¶ 18. This process took almost 6

United States District Court
Northern District of California

3

months to complete.  Dkt. No. 44 at 4; Dkt. No. 44-3 (Nagel decl.) ¶ 18.  The documents were then sent to a single "FOIA Officer for review and dissemination to the requestor."  Dkt. No. 44 at 4; Dkt. No. 44-1 ¶ 18.  USDA represents that over 2,850 personnel hours have already been spent on responding to plaintiffs' FOIA request.  Dkt. No. 44 at 4; Dkt. No. 44-3 ¶ 18.

**DISCUSSION**

## I.    LEGAL STANDARDS

The "basic purpose" of FOIA is to "open agency action to the light of public scrutiny," regardless of the "particular purpose for which the document is being requested."  *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 772 (1989) (internal quotations omitted); *see also ACLU of Northern California v. U.S. Dep't of Justice,* 880 F.3d 473, 482 (9th Cir. 2018) ("FOIA was enacted to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.") (cleaned up).  "Without question, the Act is broadly conceived.  It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands."  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (internal quotations omitted).

Even so, Congress provided for several exemptions from disclosure under FOIA to protect "legitimate governmental and private interests" that might be harmed.  *Id*. at 152 (internal quotations omitted).  Although the exemptions "are to be narrowly construed," *ACLU*, 880 F.3d. at 483, "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' *FBI v. Abramson*, 456 U.S. 615, 630-631 (1982), and '[t]hose exemptions are as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement,' *Encino Motorcars, LLC v. Navarro,* 584 U.S. 79, 89 (2018)," *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427, 439 (2019) (brackets in original).  "The government always bears the burden to show that a given document is covered by an exemption and should be withheld."  *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 808 (9th Cir. 1995) (citing 5 U.S.C. § 552(a)(4)(B)).

"Most FOIA cases are resolved by the district court on summary judgment, with the district court entering judgment as a matter of law."  *Animal Legal Defense Fund v. U.S. Food &*

United States District Court
Northern District of California

United States District Court
Northern District of California

*Drug Administration*, 836 F.3d 987, 989 (9th Cir. 2016) (en banc). The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and the Court may grant summary judgment as to less than the entire case and just portions of a claim or defense. Fed. R. Civ. P. 56(a).

## II.   STANDING

USDA made a rather cursory objection to FWW's standing to sue in this case. It suggests that "Food & Water Watch does not have standing to challenge the redactions to, and withholding of, the documents produced in response to" the FOIA request because FWW was not a party to the request. Dkt. No. 44 at 11.

USDA misreads the complaint. The redaction and withholding claim under Section 552(a)(3) is alleged in Count Two of the complaint in the name of ALDF only. Dkt. No. 1 ¶¶ 70-71. FWW is not a party to this claim. Consequently, USDA's standing concern is wholly misdirected on this score.

USDA did not object in the first instance to FWW's standing to bring the reading room claim in Count One under Section 552(a)(2). It belatedly said in a reply brief that FWW "has not established standing" for this claim because a "FOIA reading room is not the only means by which FWW could obtain the records it seeks." Dkt. No. 50 at 3.

There are two substantial problems with this contention. First, USDA was a day late and a dollar short in raising this objection only in a reply brief, and the Court may disregard it for that reason alone. *See Louis v. Healthsource Glob. Staffing, Inc.*, No. 22-CV-02436-JD, 2022 WL 4866543, at *2 (N.D. Cal. Oct. 3, 2022). Second, the point USDA is trying to make is hard to follow. The possibility that FWW might have other means of obtaining NEPA CAFO records, which is not at all a self-evident proposition, says nothing about FWW's standing to sue under Section 552(a)(2) in this case.

Even so, "courts have an 'independent obligation' to police their own subject matter jurisdiction, including the parties' standing," irrespective of a party's failure to present the question properly. *ALDF*, 935 F.3d at 866 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488,

499 (2009), and citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). The record here amply establishes FWW's standing to bring the reading room claim. FWW stated, without dispute by the government, that its members "live, work, and recreate in close proximity to CAFOs." Dkt. No. 1 ¶ 8; *see also* Dkt. No. 38-2 ¶ 5. Its mission is "to hold the CAFO industry accountable for its adverse impacts on rural communities and the environment and to hold the government accountable for the unchecked pollution and consolidation of the livestock industry." Dkt. No. 1 ¶ 8; *see also* Dkt. No. 38-2 at ¶ 4. FWW alleged on its own behalf that USDA's lack of compliance with FOIA's reading room provision prevents it from timely participating in public comment during NEPA environmental review. *See* Dkt. No. 1 at 14; Dkt. No. 38-2 ¶¶ 11-13. This is enough to demonstrate its standing to sue under Section 552(a)(2). *See ALDF*, 935 F.3d at 866-69 ("The 'invasion of a legally protected interest' occurs when the agency decides not to post records qualifying for § 552(a)(2) treatment, or when a plaintiff visits the online reading room and information required to be there is nowhere to be found.") (internal citation omitted).

It bears mention that this lawsuit is justiciable even if FWW were not a proper plaintiff for the Section 552(a)(2) claim, which is not the case. ALDF has standing for both counts, as the government effectively acknowledged by not challenging its standing in any respect. *See* Dkt. No. 44 at 11 (attacking only FWW's standing); *see also Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 & n.9 (1977) ("[W]e have at least one individual plaintiff who has demonstrated standing . . . . Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit"); *McCarthy v. Intercontinental Exch., Inc.*, No. 20-CV-05832-JD, 2021 WL 6072817, at *2 (N.D. Cal. Dec. 23, 2021) ("When there are multiple plaintiffs, as is the case here, the presence of one plaintiff with standing assures that the controversy before the Court is justiciable.") (cleaned up).

## III.   THE SECTION 552(a)(2) READING ROOM

Plaintiffs' main claim in this case is that USDA must proactively post "NEPA CAFO Records" to its online reading room, including records that are generated by the agency in the

future, without waiting for FOIA requests. *See* Dkt. No. 38 at 8-14. The salient question is whether FOIA commands this proactive action by an agency.

Answering this question begins and ends with the plain language of the statute. *See Commonwealth of Puerto Rico v. Franklin California Tax-free Trust*, 579 U.S. 115, 125 (2016). To start, the "most-recognized provision" of FOIA is Section 552(a)(3). *ALDF*, 935 F.3d at 862. This is the provision that allows "members of the public [to] request agency records, and the agency -- subject to limited exemptions -- must produce them." *Id.*

FOIA has a lesser-known reading room provision in Section 552(a)(2). This provision imposes an "affirmative obligation" on agencies to make certain records available "on an ongoing basis, no request necessary." *Id*. As Section 552(a)(2) states:

> (2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format --
>
> (A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;
>
> (B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;
>
> (C) administrative staff manuals and instructions to staff that affect a member of the public;
>
> (D) copies of all records, regardless of form or format --
>
> > (i) that have been released to any person under paragraph (3); and
> >
> > (ii)(I) that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or
> >
> > > (II) that have been requested 3 or more times; and
>
> (E) a general index of the records referred to under subparagraph (D)[.]

5 U.S.C. § 552(a)(2).

This section "became known as the 'reading-room' provision because . . . agencies historically met their § 552(a)(2) obligations by placing the appropriate records in a physical, public reading room." *ALDF*, 935 F.3d at 862. The statute was amended over time to permit agencies to make these records available "in an electronic format," and so "agencies today simply

United States District Court
Northern District of California

post records in electronic reading rooms on their websites rather than requiring citizens to visit an agency's physical reading room in person." *Id*.

Plaintiffs' proactive posting claim is based on Section 552(a)(2)(D). In their view, this provision requires that USDA post to its online reading room "NEPA CAFO Records" which might be created in the future without the need for a specific request for them. It bears emphasis that plaintiffs' claim is based entirely on subsection (D) of Section 552(a)(2). Plaintiffs do not contend that these records are subject to reading room posting as "final opinions" under Section 552(a)(2)(A), "statements of policy and interpretations" under Section 552(a)(2)(B), or "administrative staff manuals and instructions to staff that affect a member of the public" under Section 552(a)(2)(C). They hang their posting claim purely on the hook of Section 552(a)(2)(D), which is understood to apply to "frequently requested records." *See ALDF*, 935 F.3d at 862.

Section 552(a)(2)(D) was added to FOIA's reading room provision in 1996. *See id*. & n.1 (agencies directed to keep in mind that purpose of amendment was "to reduce the number of future requests for the same information"); *see also Lipton*, 316 F. Supp. 3d at 248 ("The 1996 Amendments added to the reading-room provision a requirement that agencies publish electronically copies of any records that already have been released under the reactive provision of FOIA and that have attracted or likely will attract more such requests."). Further amendment in 2016 "retained an agency's ability to determine which records deserved § 552(a)(2) treatment based on the likelihood of 'becoming the subject of subsequent requests,' but also codified the 'Rule of 3,' requiring automatic reading-room treatment for records previously released under § 552(a)(3) and requested three or more times." *ALDF*, 935 F.3d at 863 (brackets omitted; quoting 5 U.S.C. § 552(a)(2)(D)).

### A.    Future NEPA CAFO Records

The plain text of Section 552(a)(2)(D) puts to rest plaintiffs' theory that FOIA requires USDA to post "future NEPA CAFO Records" to their online reading room. Dkt. No. 1 ¶ 74; *see also* Dkt. No. 38 at 14 (asserting that FSA is violating FOIA by failing to proactively disclose "NEPA CAFO Records that it will prepare pursuant to its NEPA review"). Plaintiffs rely upon both Section 552(a)(2)(D)(ii)(I) (requiring posting of records determined by the agency to be

8

frequently requested records) and Section 552(a)(2)(D)(ii)(II) (requiring posting of "Rule of 3" documents that have been requested 3 or more times). But they overlook the fact that these provisions are dependent upon the language of Section 552(a)(2)(D)(i). To come within the scope of Section 552(a)(2)(D) in the first instance, a record must "have been released to any person under paragraph (3)." 5 U.S.C. § 552(a)(2)(D)(i). Only then do Sections 552(a)(2)(D)(ii)(I) or (II) come into play.

Consequently, a record is not required to be posted to the reading room under Section 552(a)(2)(D) unless it has already been requested and released by the government under Section 552(a)(3). This plain language rules out plaintiffs' suggestion that records which have yet to be created are subject to posting. The words of Section 552(a)(2)(D) speak of records in existence in the here and now, and not of mere possibilities in the future, like the shadows swirling around Dickens' Ghost of Christmas Yet To Come. Records that do not exist cannot have been requested and "released . . . under paragraph (3)," and so cannot be within the scope of Section 552(a)(2)(D)(i).

The ordinary meaning of the words in Section 552(a)(2)(D)(i) confirm this construction. A "record" was understood in 2016, when Congress added the section, to mean "a piece of information or a description of an event that is written on paper or stored in a computer." *Record,* Cambridge Dictionary (Feb. 4, 2016).[1] "Released" was understood as meaning "to make available to the public" a concrete thing such as a document or publication. *Release,* Merriam-Webster Dictionary (Feb. 6, 2016).[2] Needless to say, these ordinary meanings have not changed since 2016.

Plaintiffs did not present a contrary interpretation of the text of Section 552(a)(2)(D). Instead, they pointed to words in Section 552(a)(2)(D)(ii) that they understood to connote future events. *See* Dkt. No. 46 at 4 (Section 552(a)(2)(D)(ii) concerns records "that because of the nature

---

[1] Archived at https://web.archive.org/web/20160204190631/dictionary.cambridge.org/us/dictionary/english/record.

[2] Archived at https://web.archive.org/web/20160206122704/https://www.merriam-webster.com/dictionary/release.

of their subject matter, the agency determines have become or are likely to become the subject of *subsequent* requests for substantially the same records.") (emphasis in original) (quoting 5 U.S.C. § 552(a)(2)(D)(ii)).  But "subsequent" modifies "requests," and not "records."  An agency is directed to consider future requests that it anticipates will be made for previously-released records.  That is a far cry from imposing a duty to disclose new records that the agency may create in the future.

So too for the words "records that are 'substantially the same,'" which plaintiffs also emphasize.  *Id*. at 6.  Section 552(a)(2)(D) applies when a specific record, and not merely a substantially similar record, was "released to any person under paragraph (3)."  Only then does Section 552(a)(2)(D)(ii)(I) contemplate the posting of such records if the agency determines that that they are or will likely be the "subject of subsequent requests for substantially the same records."  5 U.S.C. § 552(a)(2)(D).  The record must have been one that was previously requested and "released" before it is required to be posted to a reading room.

*ALDF* does not point to a different conclusion, as plaintiffs suggest.  It is true that the decision mentions "categories of records" and "ongoing" duties to post to the reading room, *ALDF*, 935 F.3d at 862, but that is of no moment here.  *ALDF* was an entirely different case from this one.  The documents at issue in *ALDF* were existing documents that the agency had previously posted to its reading room but had then "removed . . . from its website" because the agency became concerned "that its system for reviewing and redacting records was insufficient."  *Id*. at 864.  The main legal question was whether a district court's authority under FOIA is limited to "ordering the agency to produce a copy of a requested document to the requester," as opposed to encompassing the broader power to "compel agencies to publish records in online reading rooms under FOIA's reading-room provision."  *Id*. at 866, 874.  None of these questions or circumstances are in play here.  So too for the circuit court's conclusion that FOIA vests in district courts "the authority to order an agency to post records in an online reading room," *id*. at 869, which neither party takes issue with.  Overall, *ALDF* is not determinative of the reading room dispute in this case.

United States District Court
Northern District of California

As a closing point, plaintiffs suggest that a proactive posting duty nevertheless should be found in Section 552(a)(2)(D) to implement the policy of disclosure inherent in FOIA. *See* Dkt. No. 46 at 4. But "it is quite mistaken to assume . . . that whatever might appear to further the statute's primary objective must be the law." *Henson v. Santander Consumer USA Inc.,* 582 U.S. 79, 89 (2017) (internal quotations omitted). The Court is bound by the plain meaning of the statute, and has no license to do more than Congress authorized. Summary judgment is granted in favor of the government on the claim of proactive posting of future documents under Section 552(a)(2)(D).

### B.    Existing NEPA CAFO Records

There is another reading room dispute over existing records that plaintiffs contend should have been posted. Plaintiffs say that "USDA's argument that section 552(a)(2)(D) does not encompass 'future' records has no bearing on Plaintiffs' claim for proactive disclosure of past and current NEPA CAFO Records -- information that plainly 'already exists.'" Dkt. No. 46 at 3. That is a fair reading of the statute but plaintiffs have not carried their overall burden on summary judgment for this portion of the reading room claim.

The problem for plaintiffs is that they provided no specificity whatsoever for the existing records said to be at issue here. Plaintiffs made a sweeping reference to "NEPA CAFO Records," and mentioned a few scattershot examples of such documents. *See* Dkt. No. 38 at 9-10. But they did not provide a useful description of the records they have in mind. This anemic presentation is too unbounded and open-ended to be a proper basis for compelling USDA to post documents on the reading room. It falls well short of meaningfully identifying a "record" that may be subject to Section 552(a)(2)(D). The Court cannot discern which records plaintiffs believe should be posted, and what the statutory grounds for posting may be under Section 552(a)(2)(D)(ii)(I) or (II). Plaintiffs' summary judgment request on this claim is denied.[3]

---

[3] If plaintiffs wish to pursue this issue, the parties should meet and confer about the posting of existing NEPA CAFO records to resolve any remaining disputes. If a resolution is not reached, the parties may file by May 22, 2026, a joint statement identifying the specific documents in dispute, and a proposal for next steps.

11

**IV.     THE SECTION 552(a)(3) FOIA REQUEST**

ALDF's other FOIA claim concerns the government's response to ALDF's Section 552(a)(3) request for records on January 18, 2024.  Dkt. No. 1 ¶ 70.  USDA "produced some information but also redacted information on the asserted bases of FOIA exemptions 3 and 6."  Dkt. No. 38 at 14.

ALDF challenges the redactions.  There are four types of records at issue.  Three are created during the NEPA review process before a loan or loan guarantee is approved.  Dkt. No. 38-1 ¶¶ 6-7; Dkt. No. 44-4 ¶¶ 23-26.  These documents are:  Environmental Screening Worksheets (ESWs), Environmental Assessments (EAs), and public notices of availability.  Dkt. No. 38 at 14-15.  The fourth type is loan information spreadsheets.  *Id*.  The spreadsheets concern direct and guaranteed loans that USDA has approved in final.  Dkt. No. 39, Exh. 11.

The disputed redactions consist of:

- In the **ESWs**, USDA's withholding of:  (1) the name of the loan recipient, (2) the location of FSA's proposed action, and (3) information providing background and describing FSA's proposed action.

- In the **EAs**, USDA's redactions of (1) the name of the loan recipient, (2) the location of FSA's proposed action, (3) information providing background and describing FSA's proposed action, (4) other location information, including maps and photos of the site, (5) state permit information, (6) manure and other waste quantification in the CAFO's manure management plan, and (7) lender information.

- In the **Public Notices of Availability**, USDA's redactions of all information, including information about the CAFO and its location.

- In the **Loan Information Spreadsheet**, USDA's redactions of borrower names and addresses from its loan data for USDA's loan guarantees to CAFOs, and its redactions of CAFO sizes from its loan data for direct loans and loan guarantees to CAFOs.

Dkt. No. 38 at 14-15 (emphasis in original).

USDA proposes to justify the withholdings under FOIA Exemptions 3 and 6.  Dkt. No. 44 at 11-22.  The Court takes the exemptions up in turn.

United States District Court
Northern District of California

12

**A.      Exemption 3**

In pertinent part, Exemption 3 allows the government to withhold records when a statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue."  5 U.S.C. § 552(b)(3).  USDA says that Section 1619 of the Food, Conservation and Energy Act, 7 U.S.C. § 8791 (Section 8791), bars disclosure of the information plaintiffs seek.  *See* Dkt. No. 44 at 11-12.

Whether Exemption 3 was properly applied is determined in two steps.  "First, we determine whether the withholding statute meets the requirements of Exemption 3.  Then, we determine whether the requested information falls within the scope of the withholding statute."  *Ctr. for Biological Diversity v. U.S. Dep't of Agriculture*, 626 F.3d 1113, 1116 (9th Cir. 2010) (cleaned up).  The parties agree that Section 8791 is a withholding statute for purposes of Exemption 3.  *See* Dkt. No. 46 at 10; Dkt. No. 44 at 11-12.  Other courts have concluded the same.  *See, e.g., Telematch, Inc. v. U.S. Dep't of Agriculture*, 45 F.4th 343, 348 (D.C. Cir. 2022).

Section 8791 broadly prohibits the disclosure of "information provided by an agricultural producer or owner of agricultural land concerning the agricultural operation, farming or conservation practices, or the land itself, in order to participate in programs of the Department."  7 U.S.C. § 8791(b)(2)(A).  Congress enacted it in 2008 to supersede a decision by the D.C. Circuit in *Multi Ag Media LLC v. Department of Agriculture*, 515 F.3d 1224 (D.C. Cir. 2008), where the court read FOIA to permit a broad release of producer information.  *See Telematch*, 45 F.4th at 347.  Congress mandated substantially greater restrictions on disclosure of producer information, subject to expressly defined exceptions for disclosure of "payment information (including . . . the names and addresses of recipients of payments)" and "information [that] has been transformed into a statistical or aggregate form."  7 U.S.C. § 8791(b)(4).

The parties dispute two main issues:  (1) whether Section 8791 prohibits the disclosure of "information provided by an agricultural producer" after it is used in a document prepared by the USDA, and (2) the scope of the "payment information" exception.

**1.    "Information Provided by an Agricultural Producer"**

The parties' disagreement here turns on the meaning of the phrase "information provided by an agricultural producer." 7 U.S.C. § 8791(b)(2)(A). ALDF focuses on the word "provided" to say that Section 8791 prohibits disclosure only of the documents that a producer prepares and sends to USDA. ALDF urges that documents prepared by USDA which contain information obtained from a producer are not barred from disclosure because such documents are "provided" by USDA, and not a producer. *See* Dkt. No. 38 at 16-17. For this proposition, ALDF relies primarily on a district court decision which concluded that ESWs "are not provided by farmers and ranchers because they reflect Agency analysis and work" and so were outside the limitations of Section 8791. *Humane Society*, 549 F. Supp. 3d at 85 (internal quotations omitted).

USDA focuses on the word "information," and says that Section 8791 covers the facts, figures, and data that a producer sends to USDA, and not just the literal documents they were provided in. *See* Dkt. No. 44 at 14. In USDA's view, this means that such information retains its protections from disclosure under Section 8791 when republished in a USDA document unless it falls within the payment or aggregated data exceptions in the statute. *Id.*

USDA has the better reading of Section 8791. As always, the analysis begins and ends with the plain language of the statute. The ordinary meaning of "information" is "knowledge communicated concerning some particular fact, subject, or event; that of which one is apprised or told; intelligence, news." *Information,* Oxford English Dictionary (Oct. 24, 2023).[4] As this definition denotes, "information" is the substance of a communication, and not the communication itself. The ordinary meaning of to "provide" is "to supply or make available (something wanted or needed)," Merriam-Webster Dictionary (Dec. 26, 2005),[5] which simply denotes the action of transmitting information and the like.

---

[4] Archived at https://web.archive.org/web/20231024031129/https://www.oed.com/dictionary/information_n. Oxford English Dictionary notes that this definition of information has been stable since the 14th century.

[5] Archived at https://web.archive.org/web/20051226034327/https://www.merriam-webster.com/dictionary/provide.

United States District Court
Northern District of California

These everyday definitions demonstrate that Congress intended to shield the substance of the information provided by agricultural producers, and not merely the document that was the means of communicating it, as ALDF would have it. Nothing in the text of the statute indicates that Congress intended the protection afforded to producer information to vanish simply because USDA repeated the information in its own documents. The exception for "information [that] has been transformed into a statistical or aggregate form," 7 U.S.C. § 8791(b)(4), strongly connotes that Congress meant no such thing. This exception plainly contemplates that producer information may be disclosed only if it has been anonymized by being blended into statistical or aggregated formats. The clear implication is that, in all other formats, including republishing by USDA, the information retains its protection from disclosure.[6]

Overall, Section 8791 commands that producer information may not be disclosed except in the limited circumstances Congress expressly identified. Nothing in the plain text of Section 8791 indicates that Congress intended an unstated and additional disclosure exception for information re-used in an agency document, as plaintiffs urge. The Court may not assume that "Congress has omitted from its adopted text" an exception "that it nonetheless intends to apply," especially "when Congress has shown elsewhere in the same statute that it knows how to make such a[n] exception] manifest." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005).

Consequently, USDA correctly relied on Exemption 3 and Section 8791 to redact information provided by producers. Whether this was properly done is less clear in the record. USDA said that "[a]ll of the information in these challenged redactions is producer-submitted as it is derived from the agricultural producers' loan applications and producer loan applications with private lenders for which they seek a guarantee from FSA." Dkt. No. 44 at 15. But USDA's actual factual submission was not nearly as robust as this statement implies.

---

[6] For these reasons, the Court parts company with *Humane Society,* 549 F. Supp. 3d at 85, which found that documents prepared by the agency were not "information" provided by a provider. That conclusion cannot be reconciled with the plain language of Section 8791, which governs here. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says[.]").

United States District Court
Northern District of California

United States District Court
Northern District of California

USDA filed a declaration by Carol Nagel, a USDA information specialist, who averred that FSA would not have had information such as "the name of the applicant" and "the requested loan amount, the proposed purpose of the loan, descriptions of what the borrower wants to do with the funds, the type of operation the producer or landowner plans for the land, and/or the type of project being constructed . . . but for the producer submitting it in a loan application." Dkt. No. 44-3 ¶ 25. But this statement was made only for direct loan applications sent to FSA by producers. *Id*. No similar statement was made for FSA's loan guarantee information. It is also not clear whether the statement applies to information in other redactions that plaintiffs challenge, such as "information providing background and describing FSA's proposed action" for the ESWs and EAs, "the location of FSA's proposed action," "other location information, including maps and photos of the site," "state permit information," "manure and the other waste quantification in the CAFO's manure management plan," and "lender information" for the EAs, and the location and information for the CAFOs in the public notices of availability. Dkt. No. 38 at 14-15.

Overall, the Court cannot determine if the entirety of the redactions made under Exemption 3 were within the scope of Section 8791 for producer-provided information. The parties are directed to meet and confer to discuss the application of this order to the Exemption 3 withholdings and to resolve any remaining disputes. If resolution is not possible, the parties are directed to file a joint proposal by May 22, 2026, identifying the specific redactions as to which a dispute remains, and a joint proposal for resolution of the dispute.

### 2. "Payment Information"

USDA must disclose information that satisfies Section 8791's exception for payment information. As Section 8791(b)(4) expressly states, "[n]othing in this subsection affects -- (A) the disclosure of payment information (including payment information and the names and addresses of recipients of payments) under any Department program that is otherwise authorized by law."

The parties' dispute about the scope of this exception concerns only the information redacted from the loan information spreadsheets. Of the four types of documents at issue, only the loan information spreadsheets concerned data about loans and loan guarantees USDA has actually

16

made. *See* Dkt. No. 39 (Liu decl.) ¶ 12. The other three types of documents -- ESWs, EAs, and public notices of availability -- were created during a pre-approval process in which the government assessed the environmental implications of the proposed action as part of deciding whether a loan or guarantee will be authorized. *See* Dkt. No. 38-1 ¶¶ 6, 13; Dkt. No. 44-1 ¶ 10; Dkt. No. 44-4 ¶¶ 23-26. No actual payment has been made at that stage, and so such pre-approval documents cannot reasonably be described as "payment information" under Section 8791. Other courts have reached the same conclusion. *See, e.g., Pub. Just. Found. v. Farm Serv. Agency*, 538 F. Supp. 3d 934, 941 (N.D. Cal. 2021) ("No application document submitted by farmers constitutes payment information.").

For the loan information spreadsheet, the parties agree that information about direct loans is covered by the payment information exception, but disagree whether loan guarantees are also covered. USDA says that only loans, and not loan guarantees, constitute payments because only loans involve a direct transfer of funds. Dkt. No. 44 at 13-14. In USDA's view, this means it did not need to disclose payment information for loan guarantees.

Not so. The ordinary meaning of a "payment" at the time Congress enacted Section 8791 was "[t]he money *or other valuable thing* so delivered in satisfaction of an obligation." *Payment*, Black's Law Dictionary (8th ed. 2004) (emphasis added). This covers a loan guarantee, which is a "valuable thing," albeit not immediately monetary, that USDA provided to a producer. That common-sense understanding is reflected in the Federal Credit Reform Act, where Congress commanded that the budget should account for the expected cost of loan guarantees at the time the guarantee is made, not just when a direct transfer of funds occurs. *See* 2 U.S.C. § 661a(5)(C) (defining the "cost of a loan guarantee" as the expected value of the cashflows to and from the government); 2 U.S.C. § 661 (noting that the purpose of the Federal Credit Reform Act was to "more accurately [measure] the costs of Federal credit programs"). USDA cherry-picked a dictionary definition to the effect that a payment is "the action or process of paying," Dkt. No. 44 at 13, but that says nothing about what is being paid. Payments include monetary and non-monetary transfers, namely loans and loan guarantees.

Section 8791 specifically defines payment information to include "names and addresses of recipients of payments." 7 U.S.C. § 8791(b)(4)(A). Consequently, Section 8791 permits the disclosure of borrower names and addresses for loan guarantees, and USDA's redaction of that information from the loan information spreadsheet was improper.

USDA's redaction of CAFO sizes for direct loans and loan guarantees is a different issue. CAFO sizes are not an obvious element of payment information, and plaintiffs did not present a good reason to conclude otherwise. USDA's redaction of this information was consistent with the scope of the exception in Section 8791.

### B.      Exemption 6

As a fallback position, USDA urges that Exemption 6 authorized the withholding of borrower names and addresses for loan guarantees in the loan information spreadsheet, even if Exemption 3 did not.[7] Exemption 6 allows the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

Neither side disputes that the loan information spreadsheets, which contain the names and addresses of agricultural producers, are "similar files" within the purview of Exemption 6. *See* Dkt. No. 46 at 15. This is for good reason. Any records "which can be identified as applying to [an] individual" are "similar files" for purposes of this exemption. *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982) (quotations omitted); *see also Van Bourg, Allen, Weinberg & Roger v. NLRB*, 728 F.2d 1270, 1273 (9th Cir. 1984) ("similar files" is interpreted broadly and includes "[g]overnment records containing information that applies to particular individuals").

---

[7] This order requires follow-up work by the parties. If this work indicates that withholdings under Exemption 3 were not warranted for other redactions, the Court will consider whether Exemption 6 might apply. That determination is not required now. *See Ctr. for Biological Diversity v. U.S. Dep't of Agriculture*, 626 F.3d 1113, 1118-19 (9th Cir. 2010) (if one FOIA exemption justifies redactions, court need not reach whether another exemption might also justify the same redactions). The Court will also take up later as warranted USDA's argument that the redaction of "agricultural producer geospatial information" including "addresses, maps and photos" was justified under 7 U.S.C. § 8791(b)(2)(B). *See* Dkt. No. 44 at 16.

18

The Court balances competing interests to determine whether USDA's withholding of information was proper under Exemption 6. The threshold question is "whether release of the information would constitute a clearly unwarranted invasion of the person's privacy." *Elec. Frontier Found. v. Off. of the Dir. of Nat. Intel.*, 639 F.3d 876, 886 (9th Cir. 2010) (internal quotations omitted), *abrogated on other grounds by Animal Legal Defense Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016); *see also Rojas v. Fed. Aviation Admin.*, 941 F.3d 392, 404 (9th Cir. 2019). The personal privacy interest at stake needs to be "nontrivial." *Cameranesi v. U.S. Dep't of Def.*, 856 F.3d 626, 637 (quotations omitted). This is "not a demanding standard," *Rojas*, 941 F.3d at 405, and the privacy interest need not be "substantial." *Cameranesi*, 856 F.3d at 642. The "potential for harassment," *Forest Serv. Emps. For Env't Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026 (9th Cir. 2008), or interference with an "individual's control of information concerning his or her person," *Reps. Comm.*, 489 U.S. at 763, are examples of nontrivial privacy interests. If a nontrivial privacy interest is in play, the Court will "balance the public interest in disclosure against the interest Congress intended the exemption to protect." *Cameranesi*, 856 F.3d at 637 (quoting *Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994)).

As a general principle, an individual has a privacy interest in his or her name, home address, and other personally identifiable information that is well beyond non-trivial. *See, e.g., Fed. Labor Relations Auth.*, 510 U.S. at 501 (privacy of the home "is accorded special consideration in our Constitution, laws, and traditions"); *Minnis v. U.S. Dep't of Agriculture*, 737 F.2d 784, 787 (9th Cir. 1984) (recognizing privacy interests under FOIA of an individual's name and address in a use permit application); *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 617 (2021) (recognizing "gravity of the privacy concerns" and holding unconstitutional California law requiring disclosure of donors' names and addresses); *Pomares v. Dep't of Veterans Affairs*, 113 F.4th 870, 883-84 (9th Cir. 2024) (recognizing nontrivial privacy interests under FOIA of individual's names and contact information).

Although a good argument can be made that this privacy interest applies here and weighs in favor of nondisclosure, Congress has already struck the balance in favor of the disclosure of producer payment information. In the exception for such information in Section 8791, Congress

19

United States District Court
Northern District of California

determined that the public interest in seeing how the government's money is spent outweighed the privacy interests of the producers. *See Telematch,* 45 F.4th at 352. This specific statutory provision trumps the general terms of FOIA Exemption 6. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general.") (brackets and quotations omitted); *Sharpe v. Puritan's Pride, Inc.,* 466 F. Supp. 3d 1066, 1075 (N.D. Cal. 2020) (same). Consequently, there is no room under Exemption 6 for USDA to second-guess Congress on the disclosure of the payment information, or to substitute its own balancing determination.

The redactions of borrower names and addresses for loan guarantees in the loan information spreadsheet was consequently not proper under Exemption 3 or Exemption 6, and that information must be provided to ALDF.

**CONCLUSION**

To recap, summary judgment is entered in favor of USDA and against plaintiffs on their allegation that defendants must proactively post future NEPA CAFO records to an online reading room pursuant to 5 U.S.C. § 552(a)(2)(D) without a prior release. For the redactions, all names and addresses in the loan information spreadsheets for loan guarantees must be disclosed in the documents produced to ALDF. ALDF's motion for summary judgment is granted on this issue, and USDA is ordered to provide new versions of the spreadsheets that disclose this information by May 1, 2026. For the follow-up work that remains, the parties are directed to meet and confer and to file by May 22, 2026, a joint proposal identifying the scope of the parties' remaining disputes and proposing a process for resolution.

**IT IS SO ORDERED.**

Dated: April 13, 2026

_____
JAMES DONATO
United States District Judge